IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jeffrey Westerlund,  )<br>  )<br>         Plaintiff,  )<br>  )<br>vs.  )<br>  )<br>Carolyn W. Colvin, Acting  )<br>Commissioner of Social Security,  )<br>  )<br>         Defendant.  )<br>_____) | Civil Action No. 6:14-4622-RMG-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on May 17, 2012, alleging that he became unable to work on April 13, 2012. The applications were denied initially and on reconsideration by the Social Security Administration. On November 21, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Brenda Cartwright, an impartial vocational expert, appeared on May 15, 2014, considered the case *de novo*, and on June 20, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on October 8, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> (2)     The claimant has not engaged in substantial gainful activity since April 13, 2012, the alleged onset date (20 C.F.R, §§ 404.1571 *et seq.*, and 416.971 *et seq*.).
>
> (3)     The claimant has the following severe impairments: obesity, hypertension, diabetes mellitus, peripheral neuropathy, status post multiple back surgeries, posttraumatic arthritis of the left foot, cervical radiculopathy, and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except: he must be allowed to change positions once per hour; he can frequently, but not constantly, handle and finger; and he is limited to simple, routine, repetitive tasks.
>
> (6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7)     The claimant was born on May 1, 1969, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently

changed age category to a younger individual age 45-49 (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from April 13, 2012, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

3

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by

4

substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 42 years old on his alleged disability onset date and 45 years old on the date of the ALJ's decision. He has a high school education (Tr. 292) and past relevant work as a sign erector, forklift operator, hand packager, bench carpenter, motorcycle sales person, and automobile salesperson (Tr. 28).

On August 20, 2008, the plaintiff had an MRI of his lumbar spine that showed a small inferior disc space at S1-S2, loss of normal lumbar lordosis, a massive disc extrusion at L4-5 to the right, and an annular tear and concentric bulge at L5-S1 (Tr. 366-67).  On September 29, 2009, the plaintiff underwent a decompressive laminectomy and microdiskectomy at L4-5 with bilateral posterior instrumented fusion at L4-5 with local bone graft and L4-5 TLIF with PEEK cage (Tr. 384-90).

On January 24, 2012, the plaintiff saw Samuel R. Stone, M.D., of Lowrys Family Medicine Center, regarding his diabetes (Tr. 420).  Dr. Stone commented that the

plaintiff was "just not taking [his diabetes] seriously. He eats junk all the time. He says he is cutting back and not eating anything sugary, but he is just eating anything he can get his hands on" (Tr. 420). Dr. Stone ordered some testing and raised the possibility of insulin if the plaintiff's labwork was not better (Tr. 420).

On February 21, 2012, the plaintiff underwent an initial clinical assessment through Catawba Mental Health Clinic. The plaintiff reported being "miserable all the time." He reported poor sleep, decreased energy, and decreased motivation. He explained that he goes to work, but it is a struggle, and when he isn't at work, he is in his room in bed. The plaintiff admitted to a past history of drug abuse but had been clean for four years. He was also noted to have a history of cycling through moods. The plaintiff's attitude was hostile and guarded. His affect was flat, and his mood was depressed and angry. The plaintiff was appropriately oriented. His remote and immediate memory was poor. He appeared to be of average intelligence. The plaintiff's diagnoses were bipolar disorder NOS; mood disorder not otherwise specified ("NOS"), and was given a Global Assessment of Functioning ("GAF")[2] score of 55 (Tr. 402-07). On March 6, 2012, the plaintiff had an initial meeting with a psychiatrist who diagnosed bipolar disorder NOS and a GAF score of 60. He prescribed an increased dose of Abilify. The plaintiff did not return for follow-up (Tr. 408, 409).

On May 15, 2012, the plaintiff complained to Dr. Stone about "hurting" feet and back (Tr. 444). Dr. Stone indicated that the plaintiff was "not watching his diet as well as he should"(*id*.). Dr. Stone diagnosed diabetes mellitus, hypertension, and chronic low back pain. He prescribed NovoLog and metformin and continued the plaintiff's other

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

medications. Dr. Stone referred the plaintiff to an orthopedist and advised diet and exercise (Tr. 417, 444).

On May 29, 2012, the plaintiff saw Michael Heinig, M.D., of Carolina Orthopaedic Surgery Associates. The plaintiff complained of moderate cervical spine pain with left arm numbness and tingling since a September 2011 car accident. The plaintiff described his neck pain as moderate and his back pain as severe. Dr. Heinig noted that the plaintiff had a history of three prior spinal surgeries as well as prior foot surgeries (Tr. 428). Dr. Heinig's examination revealed that the plaintiff had some decreased left hand sensation, but no notable upper extremity swelling, and his neck range of motion was "near full without encroachment on either side" (Tr. 430). The plaintiff was able to get up and down from the seated position without much difficulty. The straight leg-raising test was negative. Lumbar spine x-rays showed pedicle screws at L3 and L4 bilaterally with fairly well maintained disc spaces. X-rays of his cervical spine showed a wire attaching the spinous processes of C5 and C6 with some narrowing of the disc at C5-6 and a good deal more narrowing of anterior osteophyte formation at C6-7. Dr. Heinig diagnosed left cervical radicular symptoms status post C5-6 fusion with wire and mechanical lower back pain status post pedicle screw fusion at L3-4 (*id.*). Dr. Heinig prescribed a Prednisone Pak and Naprosyn, as well as six weeks of physical therapy (Tr. 431).

The plaintiff participated in physical therapy from June 19, 2012, to September 20, 2012. Piedmont Medical Center physical therapy records showed that after twelve sessions, the plaintiff demonstrated increased lumbar-spine range of motion and 5/5 lower-extremity strength (Tr. 488). The physical therapy notes show that post-treatment pain was consistently reduced to as low as zero (Tr. 492-93). He was discharged with a home exercise program without meeting all of his therapy goals.

Lumbar-spine x-rays on August 3, 2012, showed successful hardware placement and fusion with no acute abnormalities (Tr. 435).

7

On August 4, 2012, consultative examiner, Jason Madey, M.D., of Southern Medical Group Associates, LLC, examined the plaintiff at the state disability agency's request. The plaintiff exhibited only slightly decreased cervical and lumbar spine range of motion and no muscle asymmetry or atrophy (Tr. 437, 439). His gait was normal (Tr. 437). He was able to rise from a sitting position without assistance, stand on his tiptoes and heels, tandem walk without problems, and bend and squat without difficulty (*id*.). The plaintiff's grip showed 5/5 strength with adequate fine motor movements, dexterity, and ability to grasp objects bilaterally (*id*.). Neurologically, the plaintiff showed strong neck movement against resistance, good tone, and 5/5 strength bilaterally in all muscle groups (*id*.). Dr. Madey indicated that the plaintiff had decreased range of motion "in areas with surgery" (Tr. 437). Dr. Madey opined that the plaintiff would have limitations in lifting/carrying objects greater than five pounds (Tr. 438). He should avoid bending and squatting (*id*.). He could walk and stand, but would require frequent breaks, and he should be able to sit a full workday (*id*.).

On August 8, 2012, state agency medical consultant Dale Van Slooten, M.D., conducted a residual functional capacity ("RFC") assessment. Dr. Van Slooten concluded that the plaintiff could occasionally lift/carry fifty pounds, frequently lift/carry twenty-five pounds, stand/walk about six hours, and sit about six hours in an eight-hour workday (Tr. 114). Dr. Van Slooten found that the plaintiff had unlimited pushing/pulling abilities (including operation of hand and foot controls) and no manipulative limitations, but was limited to occasional climbing of ladders/ropes/scaffolds and frequent stooping and crouching (Tr. 114-15).

On August 20, 2012, the plaintiff continued to report to Dr. Stone that he was experiencing "lots of hurting all over" (Tr. 443). Three days earlier, he reported to his physical therapist that he was riding a motorcycle (Tr. 484). Dr. Stone's exam showed back and neck tenderness (Tr. 443). Dr. Stone noted that the plaintiff's diabetes was doing

better but "still fluctuating up and down, probably when he gets stressed out." The plaintiff reported taking a friend's Soma, which helped along with his hydrocodone, and Dr. Stone indicated that it would be "good to try to cut down on the hydrocodone so he is not taking so much of it all the time." Dr. Stone diagnosed chronic back pain with cervical pain and lumbar disc disease with surgery and diabetes. Dr. Stone continued the plaintiff's medications and advised the plaintiff to "eat right," which "hopefully will get him better" (*id*.).

On August 30, 2012, Dr. Stone sent a letter to the plaintiff's former counsel indicating that the plaintiff had been his patient for a little over two years. Dr. Stone stated, "Over that period of time, I have treated him for chronic back pain with failed back syndrome secondary to numerous surgeries." Dr. Stone indicated that the plaintiff also had depression, new onset Type 2 diabetes, and cervical disc problems. He stated, "During this period of time, he has attempted to work, but due to the pain, numbness and weakness, he has been unable to work . . ." Dr. Stone opined that "over the last 12 months [the plaintiff] has been completely and totally disabled," despite being "very compliant" with his medications (Tr. 442). On September 14, 2012, Dr. Stone completed a letter opining that the plaintiff " suffers from failed back syndrome; poorly controlled diabetes, and depression. I feel he is totally and permanently disabled" (Tr. 448).

On October 25, 2012, state agency medical consultant William Hopkins, M.D., reached the same conclusions as Dr. Van Slooten, except that the plaintiff was limited to occasionally lifting/carrying twenty pounds and frequently lifting/carrying ten pounds (Tr. 139-41). A second psychiatric review questionnaire completed on the same date indicated that the plaintiff's mental impairments were non-severe (Tr. 136-38)

On December 27, 2012, Dr. Stone evaluated the plaintiff for chronic back and neck pain, depression, and Type 2 diabetes. The plaintiff reported to Dr. Stone that he was "doing fair" (Tr. 449). The plaintiff stated that his back hurts "a lot," but he had not seen a specialist in a while (*id*.). The plaintiff reported eating fairly good and had lost weight. Dr.

9

Stone diagnosed diabetes Type 2 with early peripheral neuropathy, chronic back pain with known disk disease, depression, hypertension, and cervical disk. Dr. Stone ordered lab work (Tr. 449-50).

On April 29, 2013, Dr. Stone evaluated the plaintiff for follow-up of diabetes, hypertension, peripheral neuropathy, and depression. The plaintiff reported that his back was hurting him "to the point that he cannot get up and get around" (Tr. 461). The plaintiff reported that it was "very painful and very frustrating." Dr. Stone indicated that the plaintiff was eating "pretty good" but his "sugars are not controlled unfortunately." The plaintiff reported that he wasn't really working out due to his pain. Dr. Stone noted very poor sensation in the plaintiff's feet and a lot of tenderness in his back. Dr. Stone noted that the plaintiff was on Abilify, and he ordered blood work (Tr. 461-62).

On June 27, 2013, the plaintiff went to the Piedmont Medical Center because he took more pain medication than prescribed (Tr. 540-50). At the time of discharge, he reported that his back pain was two out of ten (Tr. 549).

On August 29, 2013, Dr. Stone evaluated the plaintiff for follow-up of multiple chronic conditions. The plaintiff reported back pain from prior surgery with rods and screws, and shoulder pain from prior surgery with wire. Dr. Stone noted that the plaintiff also had some depression and was very frustrated. Dr. Stone indicated that they tried to give the plaintiff "as many medications as we can. We unfortunately have run out of Cymbalta, so I am going to try to give him samples of Viibryd which is similar and see if this does not help." Dr. Stone also gave the plaintiff samples of insulin and advised that he continue to watch his diet and work on the weight (Tr. 463-64).

On October 10, 2013, Dr. Stone completed a Physical Capacities Evaluation regarding the plaintiff. Dr. Stone indicated that in an eight-hour day the plaintiff could sit for a total of three hours, could stand for a total of two hours, and could walk for a total of one hour. Dr. Stone indicated that the plaintiff could occasionally lift and carry up to five pounds

and could never lift or carry over five pounds. Dr. Stone indicated that the plaintiff could not use his hands for repetitive actions such as simple grasping, pushing, or pulling of arm controls, or fine manipulation. He indicated that the plaintiff could not use his feet for repetitive movements such as pushing and pulling of leg controls. Dr. Stone indicated that the plaintiff was unable to bend, squat, crawl, climb, or reach. Dr. Stone stated that the plaintiff had a total restriction from unprotected heights, moving machinery, marked changes in temperature and humidity, and exposure to dust, fumes, and gases. Dr. Stone explained that the plaintiff had chronic low back pain due to disc disease plus neuropathy in hands and feet from diabetes (Tr. 455-57).

On October 25, 2013, the plaintiff returned to see Dr. Heinig because of low back and left leg pain (Tr. 504), but he stated that he experienced no weakness, numbness, tingling, or swelling (Tr. 506). The plaintiff reported having about a year's worth of relief following his back surgery in 2010. He reported that he was currently having pain going down his left leg. Dr. Heinig noted that the plaintiff was taking hydrocodone and Soma. Dr. Heinig indicated that the plaintiff could extend to about thirty degrees and flex to about ten degrees. Dr. Heinig's exam showed a negative straight leg-raising test, good sensation in both lower extremities, and good lower-extremity strength. X-rays showed a L3-4 fusion with pedicle screws x4 and two rods as well as decreased disc space at L5-S1. Dr. Heinig prescribed a Predisone Pak and ordered an MRI (Tr. 504-07).

On April 17, 2014, the plaintiff reported to Aderonce Jegede, M.D., of Piedmont Medical Center, that he stopped taking his insulin about eight months ago because "he was tired of taking medications" (Tr. 562). The plaintiff was treated in the emergency room for uncontrolled blood sugars and cellulitis. His initial assessment was cellulitis, rule out evolving perirectal abscess; uncontrolled diabetes secondary to noncompliance with medication; and chronic pain syndrome. He was admitted for IV medication and stabilization through April 24, 2014. The plaintiff admitted to having

occasional chest tightness and some chronic cough with shortness of breath. He also reported chronic back pain with left leg cramps and insomnia (Tr. 561-606).

On April 27, 2014, Dr. Stone wrote a letter to the plaintiff's former counsel. He indicated that the plaintiff had been "battling several medical problems over the past several years." He indicated that the plaintiff "currently suffers from severe diabetes with peripheral neuropathy, depression, hypertension, and chronic back pain that has been resistant to therapy." Dr. Stone opined that the plaintiff is "totally and permanently disabled and will be so for at least a period of 12 months" (Tr. 511). Dr. Stone again stated that the plaintiff "has been compliant in his treatment" and "does the things that I talk to him about doing," but he continues to have "more and more problems with diabetes, back pain, and depression" (*id*.).

***Administrative Hearing Testimony***

The plaintiff testified that he lived in a house with his eighteen-year-old son (Tr. 39). The last time that he worked was in April 2012, when he worked as a car salesman 45 to 60 hours per week (Tr. 40, 311). He stopped working because the job required him to stand three to four hours at a time (Tr. 41-42, 314).

The plaintiff testified that he broke his neck in a car accident in the early 1990's, but after neck surgery, he "was doing okay" and only "lost a little mobility" (Tr. 44). He stated that, as a result of his neck injury, he continues to experience arthritis that is painful when he holds his head up (*id*.). He has also had two lower-back discectomies to stop the shooting leg pain; the last surgery was in 2008 (Tr. 44-45). He testified that "the longer I'm up, the more my lower back starts hurting" and it is "hard to bend and lift and pick things up" (Tr. 45). He stated that his pain gets progressively worse until he lies down in his bed (*id*.). He stated that his pain medication eases up the pain "a little bit" and makes his life "a little more manageable" (*id*.).

The plaintiff also testified that he fell from a roof at work and broke bones in his feet in 2000 (about 15 years ago) (Tr. 45-46). He had surgery, but the screws in his left foot feel like he has "a dagger sticking in the bottom of [his] foot all the time" (Tr. 46). The plaintiff also testified that he has diabetic neuropathy, which causes "everything from tingling to severe pain in [his] hands and feet" (Tr. 47). He testified that he takes daily shots and pills for his diabetes (id.). He stated that he was getting "better" about watching his diet and taking his medications properly (Tr. 48).

The plaintiff testified that he can sit and stand for about fifteen minutes at a time without being uncomfortable (Tr. 53-54). He testified that he can lift up to eight pounds (Tr. 54).

The plaintiff testified that in a typical day, he gets up at 8:00 to 9:00 a.m. after two to four hours of sleep. He takes his pain medication (Vicodin) and muscle relaxers (Soma) as needed (Tr. 50). Without pain medication, he reported that his pain was a nine on a ten-point scale – "almost unbearable," which causes him to stay in his bed and cry (Tr. 53). His pain medication reduces his pain to a six (*id.*). He is able to take short trips to the grocery store, do the laundry, and keep the house "clean and tidy" while working "in spurts" of 30-45 minutes, after which he lies in bed for two to three hours (Tr. 51-52). He prepares meals daily (Tr. 303). He drives and goes out alone (Tr. 304). He indicated in his function report that he has no problems maintaining his personal care, including dressing, bathing, shaving, or feeding himself (Tr. 302). He stated that lying in bed and watching television "pretty much sums up my whole life right now" (Tr. 52), but he also indicated in his function report that he spends time with his girlfriend daily and goes to church weekly (Tr. 305). He does not use crutches, a walker, a cane, or a brace/splint (Tr. 307).

After identifying the plaintiff's past relevant work, (Tr. 57-58), the ALJ asked the vocational expert the following hypothetical:

13

> Assume we have a hypothetical person whose age ranges from 42, to 45, who can do a full range of sedentary work except he would be limited to simple, routine, repetitive tasks. He would be allowed to change positions once per hour. I'm trying to read my writing. Okay. That would be it. That's hypothetical number one. Are there any jobs?

(Tr. 58). The vocational expert indicated that this would allow a food and beverage clerk, a final assembler, and a table worker. The ALJ asked about changing the hypothetical to include a limitation to frequent fingering and handling, and the vocational expert responded that this would allow the identified jobs (Tr. 58-59). The vocational expert stated that her responses were consistent with the information in the *Dictionary of Occupational Titles* except for the sit/stand option, which was based on her experience (Tr. 59).

The plaintff's attorney asked if there would be any jobs that would allow a person to "lay down during the day." The vocational expert responded that there would be no jobs (Tr. 59). The vocational expert clarified that a constant need to change positions would not allow the assembler or table work jobs but would "probably" allow the food and beverage order clerk job (Tr. 60). The attorney also asked about the limitations offered by Dr. Stone in October 2013 (Exhibit 14F, Tr. 453-57), and the vocational expert responded that this person would "not be able to do any of those jobs, or any job in the national economy because sedentary requires at least 10 pounds occasionally" (Tr. 60-61). Likewise, the vocational expert indicated there would be no jobs with the limitations given by Dr. Madey, the consultative examiner, at Exhibit 10F (Tr. 436-40) due to the lifting restriction (Tr. 61).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) asking the vocational expert an improper hypothetical and (2) improperly rejecting the opinions of Dr. Stone, the plaintiff's primary treating physician, and Dr. Madey, the consultative examiner.

***Hypothetical***

At step three of the decision-making process, the ALJ found, "With regard to concentration, persistence or pace, the claimant has moderate difficulties" (Tr. 25). In the RFC assessment, the ALJ found, in addition to physical limitations, the following mental limitations: "[H]e is limited to simple, routine, repetitive tasks" (Tr. 27). At the hearing, when the ALJ presented his RFC finding to the vocational expert in the hypothetical, he included the limitation to "simple, routine, repetitive tasks" (Tr. 58). The vocational expert offered sedentary jobs with a specific vocational preparation ("SVP") of 2, which corresponds to unskilled work (Tr. 58-59). *See* SSR 00-4p, 2000 WL 1898704, at * 3; 20 C.F.R. §§ 404.1568(a) (defining unskilled work), 416.968 (same). The ALJ relied on this evidence at step five of the sequential evaluation process to find that the plaintiff is able to perform jobs that exist in significant numbers in the national economy (Tr. 28-29).

The plaintiff argues that the ALJ erred in failing to include his moderate limitation in concentration, persistence, or pace in the hypothetical to the vocational expert. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (finding that substantial evidence supported the ALJ's decision that the plaintiff was not disabled where the hypothetical to the vocational expert included all limitations that were supported by the record as a whole). Accordingly, if the record does not support the existence or extent of a limitation, the ALJ need not include it in the hypothetical question. *See Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir.1991) (ALJ not required to include limitations or restrictions in hypothetical that are not supported by the record).

15

The plaintiff specifically relies on a recent case from the United States Court of Appeals for the Fourth Circuit, *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In that case, the court noted that the ALJ found at step 3 that Mascio had "moderate difficulties in maintaining her concentration, persistence, or pace as a side effect of her pain medication." *Id*. at 638. In the RFC finding, the ALJ limited Mascio to unskilled work. *Id.* at 635. However, in the hypothetical, the ALJ said nothing about Mascio's mental limitations. *Id.* at 637. The vocational expert responded with unskilled, light work jobs. *Id.* Accordingly, as the court noted, "The ALJ's hypothetical, together with the vocational expert's unsolicited addition of 'unskilled work,' matched the ALJ's finding regarding Mascio's [RFC]. Thus, the hypothetical was incomplete only if the ALJ failed to account for a relevant factor when determining Mascio's [RFC]." *Id.* at 637-38. The court found as follows:

> [W]e agree with other circuits that an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir.2011) (joining the Third, Seventh, and Eighth Circuits). As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace.
>
> Perhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. *See id.* at 1181. But because the ALJ here gave no explanation, a remand is in order.

*Id.* at 638. Accordingly, the plaintiff argues that, as in *Mascio*, the ALJ's limitation in the hypothetical to "simple, routine, repetitive tasks" did not account for his moderate limitation in concentration, persistence, or pace.

16

The Commissioner argues in response that the addition of the word "repetitive" in the ALJ's RFC finding and hypothetical distinguishes the case from *Mascio* because it addresses the plaintiff's ability to stay on task (def. brief at 11). However, following *Mascio*, several courts in this district and circuit that have considered such a limitation have found it insufficient to account for a claimant's moderate limitation in concentration, persistence, or pace. *See Desilets v. Colvin*, C.A. No. 2:14-cv-1693-RBH, 2015 WL 5691514, at *4-5 (D.S.C. Sept. 28, 2015) (finding limitation in RFC to "simple, repetitive tasks that are low stress and require no major decision-making or changes in the work setting in crediting some of her complaints of increased mental symptoms with stress" did not "sufficiently address the claimant's limitations in concentration, persistence, or pace as they relate to the RFC"); *Bailey v. Colvin*, C.A. No. 5:14-cv-248-DCN, 2015 WL 2449044, at *13 (D.S.C. May 21, 2015) (finding limitation in RFC to "only simple, routine, repetitive tasks; he must work in a static work environment (which I define as an environment with few work place changes)" did not account for the claimant's "limitations in concentration, persistence, or pace as to his ability to *stay on task*") (emphasis in original). *Cf. Falls v. Colvin*, 8:14-CV-00195-RBH, 2015 WL 5797751, at *7 (D.S.C. Sept. 29, 2015) (finding remand was not required as ALJ adequately addressed claimant's ability to stay on task by including the limitation "she could concentrate, persist, and work at pace to do simple, routine, repetitive tasks at one and two step instructions for extended periods, say two hour periods in an eight hour day"). *See also Herren v. Colvin*, No. 1:15-cv-00002-MOC, 2015 WL 5725903, at *6 (W.D.N.C. Sept. 30, 2015) (finding hypothetical containing restriction to "simple, routine, repetitive tasks" failed to address the claimant's ability to stay on task); *Jones v. Colvin*, No. 4:14-cv-200-RN, 2015 WL 4773542, at *6 (E.D.N.C. Aug. 13, 2015) ("[T]he hypothetical question to the VE contemplated an individual 'limited to simple, routine, repetitive tasks; should work in a low production occupation, one which would require no complex decision making, constant change or dealing with crisis situations.' The

17

majority of courts in North Carolina, including this court, have held that such restrictions do not adequately address a claimant's moderate limitations in concentration, persistence and pace."); *Scruggs v. Colvin*, No. 3:14–cv–00466–MOC, 2015 WL 2250890, at *5 (W.D.N.C. May 13, 2015) (finding that an ability to perform simple, routine, repetitive tasks in a nonproduction environment, without more, does not account for claimant's moderate difficulties in concentration, persistence, and pace).

The Commissioner contends that the plaintiff "does not have the concentration or persistence abilities to transition to multiple different tasks," and the ALJ appropriately addressed the ability to stay on task by limiting the plaintiff to repetitive tasks (def. brief at 11). Although the ALJ's findings at step three may not require any additional limitations for concentration, persistence, or pace in the RFC, the ALJ must at least provide a sufficient explanation to allow the court to conduct meaningful review of the RFC determination. *See Mascio*, 780 F.3d at 638 ("[T]he ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. . . .But because the ALJ here gave no explanation, a remand is in order.) (citation omitted). No such explanation was given by the ALJ in this case, and the Commissioner's explanation is *post hoc* rationale not included in the decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Accordingly, upon remand, the ALJ should be instructed to further consider the plaintiff's moderate limitations in concentration, persistence, or pace in the RFC assessment and, if necessary, in the hypothetical to the vocational expert, in accordance with *Mascio*.

18

*Remaining Allegations*

In light of the court's recommendation that this matter be remanded for further consideration as discussed above, the court need not address the plaintiff's remaining issues as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the ALJ should also consider the plaintiff's allegations that he erred in failing to properly consider the opinion evidence of treating physician Dr. Stone and consultative examiner Dr. Madey (pl. brief at 16-24).

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 18, 2015
Greenville, South Carolina